**NOT FOR PUBLICATION**
UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------x

In re:

KARA HOMES, INC.,                                      Chapter 11

                              Debtor.              Case No.: 06-19676 (MBK)

-----------------------------------------------------------------x

RICHARD and GINA HASPILAIRE,

                              Plaintiffs,

    - against -

BOND SAFEGUARD INSURANCE CO., KARA                      Adv. Pro. No.: 07-2240
HOMES, INC., KARA AT NAVESINK, LLC,
PATRICK TURNER, ESQ., and
ROBERT J. McGOWAN, ESQ.

                              Defendants.
-----------------------------------------------------------------x

**APPEARANCES:**

Eric H. Lindenman, Esq.
Harris Beach PLLC
100 Wall Street
New York, New York 10005
Attorneys for Bond Safeguard Insurance Co.

Peter J. Broege, Esq.
Broege Neumann Fischer & Shaver, L.L.C.
25 Abe Voorhees Drive
Manasquan, New Jersey 08736
Attorneys for Richard and Gina Haspilaire

**MICHAEL B. KAPLAN, U.S.B.J.**

**OPINION**

**I.    INTRODUCTION**

At issue in this dispute is whether Defendant, Bond Safeguard Insurance Co. ("Bond Safeguard") remains obligated to pay to the Plaintiffs, Richard and Gina Haspilaire ("Haspilaires"), pursuant to the terms of an escrow bond issued by Defendant, the contractual deposits tendered for the purchase of real property from Kara at Navesink, LLC (hereinafter "Kara"), which contract was subsequently and lawfully terminated prior to the bankruptcy filing. More specifically, whether the Plaintiffs' tender of the down payments directly to Kara, in lieu of the escrow agent and in contravention of the requirements of the contract, removes the down payments from the protections contemplated by New Jersey's statutes-thus relieving Bond Safeguard of its obligations under the bond. For the reason discussed below, the Court determines that both language of the pertinent agreements, together with the consumer protection goals underlying New Jersey's statutory scheme, warrant rulings in favor of the Haspilaires.

**II.    JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

**III.    FACTS AND PROCEDURAL HISTORY**

1.    On October 5, 2006, Kara Homes, Inc. filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

2. Subsequently, over the course of several months following the Petition Date, fifty-four (54) affiliates of the Debtor filed Chapter 11 Petitions in the Bankruptcy Court (the "Affiliated Debtors", collectively, with Kara Homes, Inc., the "Debtors").

3. Kara at Navesink, LLC ("Kara") filed for bankruptcy protection on October 5, 2006, as an Affiliated Debtor. Navesink was a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. The Debtors are developers of condominiums and other housing projects throughout New Jersey. Navesink was the developer of a community located in Middletown, New Jersey known as "Cottage Gate."

5. Pursuant to the New Jersey Condominium Act ("NJCA") and New Jersey Planned Real Estate Development Full Disclosure Act ("PREDFDA", collectively, with the NJCA, the "Deposit Acts"), any deposits received by Kara from a purchaser pursuant to a contract for sale must be deposited into an escrow account.

6. The Deposit Acts further provide that such funds must remain in escrow until the closing or termination of the contract of sale unless the developer procures an appropriate escrow bond; upon procurement of such bond, the funds may be released from escrow for use by the developer.

7. Kara procured Bond No. 5011198, dated July 21, 2004 (the "Escrow Bond"), from Bond Safeguard.

8. Kara and Patrick McGowan, Esq. (Kara's in-house counsel) entered into an escrow agreement dated July 23, 2004 (the "Escrow Agreement") thereby, among other things, naming Mr. McGowan as Escrow Agent and beneficiary of the Escrow Bond.

3

9. Pursuant to Contract of Sale dated July 24, 2004 (the "Contract"), Kara and the Haspilaires contracted for the sale of a residence (the "Property") in the Cottage Gate community being developed by Navesink. The Contract provided for a total sales price of $694,900.00.

10. By Check No. 103 dated July 26, 2004, the Haspilaires paid the sum of $69,490.00 to "Kara at Navesink LLC" and not to "Robert J. McGowan, Esq., as Escrow Agent" as required by Paragraph "5" of the Contract. Similarly, By Check No. 105 dated September 8, 2004, the Haspilaires paid the additional sum of $34,745.00 to "Kara at Navesink LLC" and not to "Robert J. McGowan, Esq., as Escrow Agent."

11. Paragraph 5 of the Contract, concerning down payments, states, in relevant part:

> Escrow of Deposits: All money paid by the Buyer to the Seller under this Agreement prior to closing will be made payable to: "Robert J. McGowan, Esq., as Escrow Agent." Robert J. McGowan, Esq., with an office located at 197 Route 18, Suite 101N, East Brunswick, New Jersey 08816, is the Seller's attorney and has been designated by Seller as Seller's deposit escrow agent (from now on called "Escrow Agent"). The Escrow Agent will deposit and hold monies paid by the Buyer under the terms of this Agreement in an Attorneys Trust Account…for at least the seven (7) day period during which the Buyer may rescind this Agreement. In the event this Agreement is not terminated within the seven (7) day period, the Seller may withdraw the deposit monies from escrow subsequent to the expiration of the seven (7) day rescission period as the Seller has posted a performance bond guaranteeing the return of the released deposit monies in the event that the Buyer becomes so entitled under the terms of this Agreement with Escrow Agent.

12. The down payments, totaling $104,235.00, tendered to "Kara at Navesink, LLC", were never placed into escrow.

13. The Contract, the Escrow Bond, and the Escrow Agreement were provided to the Haspilaires or to their counsel, Richard B. Thompson, Esq., at the time of the transaction.

4

14. By their September 20, 2004 counter-signature on an August 19, 2004 letter from Denise Carroll on behalf of Kara, the Haspilaires concluded the "attorney review" period with respect to the Contract, thereby approving all terms and conditions of the Contract of Sale.

15. Kara and the Haspilaires did not ultimately close on the Contract and the Haspilaires did not purchase the Property.

16. On June 21, 2006, Mr. Thompson, Esq. wrote to Kara requesting return of the deposit, among other things.

17. Kara did not return the down payment to the Haspilaires.

18. By Summons dated October 17, 2007, and Complaint dated October 6, 2007, the plaintiff commenced the within action.

19. By Answer dated December 13, 2007, Bond Safeguard answered the Complaint.

20. On May 30, 2008, Bond Safeguard filed a Motion for Summary Judgment seeking an Order, pursuant to Federal Rule of Bankruptcy Procedure 7056, Granting Summary Judgment in Favor of Bond Safeguard Insurance Company and Against Richard and Gina Haspilaire on All Causes of Action (the "Motion").

21. On June 17, 2008, the Haspilaires filed their Cross Motion For Summary Judgment Against Bond Safeguard Insurance Company On All Causes Of Action ("Cross Motion")

**IV.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has indicated, "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine issue for trial." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir.1993).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir.2001) (citing Celotex Corp., supra, 477 U.S. at 323). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. Matsushita, 475 U.S. at 587.

The parties have stipulated that there are no genuine issues of material fact and that the record before the Court is fully developed so as to permit the Court to resolve the issues on summary judgment.

**V.    DISCUSSION**

Bond Safeguard argues that a surety bond is "a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default or

6

miscarriage of another, the principal." Amelco Window Corp. v. Federal Ins. Co., 127 N.J. Super. 342, 346, 317 A.2d 298 (App. Div. 1974). Thus, since a surety bond is a contract, it is subject to certain rules regarding interpretation. Bond Safeguard asserts that a surety is chargeable only according to the strict terms of its undertaking and its obligation cannot, and should, not be extended either by implication or by construction beyond [the] confines of the contract." Eagle Fire Protections Corp. v. First Indemnity of American Ins., 145 N.J. 345, 354 (1996). In Eagle, the New Jersey Supreme Court recognized that if the terms of the surety bond are ambiguous, then the bond must be liberally construed in favor of the party to be benefited. Id. To that end, the Court in Eagle advised that other documents referenced in the surety bond are to be reviewed as if such documents were fully integrated into the surety bond. Id.

It is Bond Safeguard's contention that Kara's failure to place the deposit received from the Haspilaires into escrow violates the terms of the Escrow Bond and, as such, Bond Safeguard's obligations under the Escrow Bond were never triggered. Simply put, since the deposit never went into escrow, it cannot be paid from escrow. Bond Safeguard argues that the Escrow Bond is clear in that states that "the Principal and Escrow Agent, Robert J. McGowan, Esq., have entered into an Escrow Agreement that provides for the withdrawal of deposits from escrow, pursuant to the terms and conditions of the Escrow Agreement."

The Escrow Bond is one a page agreement between Kara as Principal and Bond Safeguard as surety whereby the parties agree to bond Robert McGowan, as Escrow Agent, in the amount of one million dollars. The terms of the Escrow Bond do not provide clear guidance on the issues at hand. Indeed, the pertinent provision of the Escrow Deposit Bond states:

> NOW, THEREFORE, THE CONDITION OF THIS BOND IS SUCH, that if the Principal shall well and truly carry out and conform to the terms and provisions of said contracts, as and only as such terms and provisions relate to the down payments, then this

7

>bond shall be null and void, otherwise to remain in full force and effect.

Notwithstanding the Court's repeated efforts to grasp the meaning of this paragraph and discern the respective responsibilities of the parties, the Court remains mystified by the language. The "terms and provisions" as they relate to the down payments are contained in paragraph 5 of the Contract, set forth above in paragraph 11 of the Facts, <u>infra</u>.  This section of the Contract requires deposits to be made payable to the Escrow Agent, transferred to the Escrow Agent and then held for seven days after which those funds are available to Kara for its use.  However, a fair reading of the paragraph suggests that the Escrow Bond is null and void in the event the Principal[Kara] **complies** with the terms of the Contract as it relates to down payments but otherwise, the Escrow Bond would remain in full force and effect.  Given Kara's admitted **failure to comply** with Contract by not placing the Haspilaires' deposit into escrow, the Escrow Bond would appear to survive Kara's omissions. Neither party argues that this provision is controlling, nor does the Court rest its decision on that premise alone. However, it is illustrative of the ambiguity that can be found within the Escrow Bond.

The provisions of the Escrow Bond are silent as to the effect(s) of the Principal's failure to pay the deposit to the Escrow Agent.  The Escrow Bond states that it "shall be in full force and effect until the earliest to occur of (1) (sic) passage of title to the aforesaid homes to the purchasers, (b) default of the purchasers under contracts and lawful and proper cancellations of the contracts by the Principal pursuant to the terms of the contracts for the sale of completed homes, (c) mutual consent of purchaser and the Principal."  Furthermore, the Escrow Bond states that Bond Safeguard could elect to cancel the bond by providing thirty days written notice to Principal and Obligee.  Nowhere in the record are there any facts or allegations that the Escrow

8

Bond, or the Escrow Agreement for that matter, was cancelled or not in effect at the execution of the Contract.

The Court does not find the Escrow Bond to be as clear as Bond Safeguard argues and, as such, as the Court in Eagle, supra, advised, this Court will look to the Escrow Agreement, referenced in the Escrow Bond, for further clarification. The Escrow Agreement is an agreement between Kara and McGowan wherein Kara retains McGowan as Escrow Agent so as to comply with the bonding guarantee requirements set forth by the New Jersey Department of Community Affairs pursuant to the New Jersey Condominium Act and the Planned Real Estate Development Full Disclosure Act. Perinently, Section 5:26-6.4 of the PREDFDA states:

> All deposits, down payments, or other funds paid to a developer by a purchaser shall be held in a separate trust account in a banking or similar institution located within this State or deposited with any attorney licensed to practice law in this State, until closing or termination of the contract or until a bond or other guarantee acceptable to the Agency is provided. In no event shall the escrow be released before the expiration of the seven day rescission period."

Bond Safeguard contends that, pursuant to this section, deposits must be placed in escrow in order to trigger the benefits of the bond, emphasizing the language "shall be held in a separate trust account in a banking or similar institution located within this State or deposited with any attorney licensed to practice law in this State…" The Haspilaires take a contrary position and argue that the legislature's intent was to protect purchasers from developers who are going to use the purchaser's deposit prior to the closing of title. This Court agrees.

The PREDFDA, in N.J.S.A 45:22A-22 entitled "Public Policy", specifically states:

> The Legislature in recognition of the increased popularity of various forms of real estate development in which owners share common facilities, units, parcels, lots, areas, or interests, and taking notice of the underlying complexities of these new and proliferating forms, deems it **necessary in the interest of the**

9

> **public health, safety, and welfare**, and in the effort to provide
> decent, safe and affordable housing, and **to foster the public
> understanding and trust**, that dispositions in these developments
> be regulated by the State pursuant to the provisions of this act
> (emphasis added).

Clearly, the requirements imposed by the PREDFDA are designed to protect and benefit the public by protecting the funds paid to a real estate developer pursuant to a contract for sale of real property. The language of N.J.A.C. 5:26-6.4 requires holding the deposits in escrow until one of the three enumerated events occurs: closing, termination of the contract or a bond or guarantee is provided. In this case, a bond was already in place. The last sentence of the section provides further limitation on the release of the deposit by requiring that it be held for the seven day rescission period regardless of whether one of the three enumerated events occurs. Moreover, paragraph 5 of the Contract refers to the Escrow Bond as "guaranteeing the return of the released deposit monies in the event the Buyer becomes so entitled." The presence of this language in the Contract between Buyer and Seller indicates the bond exists for the Buyer's protection. Indeed, the Escrow Bond is not in place for the protection of Bond Safeguard. Bond Safeguard, however, argues that the Escrow Deposit Bond was not issued to protect the "general public", the way surety bonds are issued to protect against inherently dangerous events like fireworks. Rather, Bond Safeguard posits that the Haspilaires are willing participants in this transaction and should have complied with the terms of the contract. The Court rejects this argument.

A suretyship is a contractual relationship resulting from an agreement whereby one person, the surety, agrees to be answerable for the debt, default or miscarriage of about, the principal. While the contract of a surety is, in a sense, collateral to a valid principal obligation, his obligation to the creditor or promise of the principal is direct, primary and absolute. The

10

surety contract is not that that obligee will see to it that the principal pays the debt or fulfills the contract, but rather that the surety will see that the principal pays or performs. See Amelco, infra. (citing 50 Am. Jur., Suretyship, s 2 at 903-904). The law recognizes the third party to a surety agreement has an enforceable right if the surety promises in the bond, either in express words or by reasonable implication, to pay money to him. If there is such a promissory expression, there need be no discussion of 'intention to benefit'. See Amelco, infra. (citing Schlanger v. Federal Ins. Co., 44 N.J. 17, 20 (1965)).

Paragraph 5 of the Contract states that "All money paid by the Buyer to the Seller under this Agreement prior to closing will be made payable to: "Robert J. McGowan, Esq., as Escrow Agent." In his affidavit, Richard Haspilaire states that he and his wife made the deposit checks payable to Kara at the instruction of Kara representatives. The language of the Contract indicates that "all money" paid to the Seller "will be made payable" to the Escrow Agent. It is foreseeable that the Haspilaires expected the deposit checks to be somehow transferred or endorsed over to the Escrow Agent, wholly outside their control. Moreover, the language of the Contract referencing the Escrow Bond as well as the provision of copies of the Escrow Bond and Escrow Agreement to the Haspilaires impliedly, if not expressly, creates an expectation of payment under that bond. Otherwise, if the 'payee' on the deposit checks was the sole determinant of whether the Escrow Bond covered the deposit, not only would the documents indicate as much, but the Haspilaires would have been so advised.

It should be noted that neither the Escrow Bond nor the Escrow Agreement contains a provision for Kara's failure to place a deposit in escrow and such a severe penalty as depriving a buyer of their deposit could not have been the intended result. The net effect of Kara's failure to escrow the deposit with the Escrow Agent was merely the absence of the deposit in the Escrow

11

Agent's account for a period seven days.  This effect is too insignificant to deny the Haspilaires the return of their deposit.

## VI.     CONCLUSION

For the reasons set forth above, the Court denies Bond Safeguard's Motion and grants the Cross-Motion in favor of the Haspilaires. An appropriate Order will be entered by the Court.

Dated: August 6, 2008

*Michael B. Kaplan*
Honorable Michael B. Kaplan
United States Bankruptcy Judge